UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | : | |
| STATE OF DELAWARE *ex rel.* | : | |
| | : | |
| TERESA KELLY, | : | |
| | : | |
| Plaintiffs | : | Civil Action No. 1:16-CV-00347-LPS |
| | : | |
| v. | : | |
| | : | |
| SELECT SPECIALTY HOSPITAL - | : | |
| WILMINGTON, INC., SELECT | : | |
| SPECIALTY HOSPITALS, INC., | : | Jury Trial Demanded |
| SELECT EMPLOYMENT | : | |
| SERVICES, INC., | : | |
| SELECT MEDICAL CORPORATION, | : | |
| and CRYSTAL CHEEK, | : | |
| | : | |
| Defendants. | : | |

_____

## <u>AMENDED COMPLAINT</u>

Relator-Plaintiff Teresa Kelly, by and through her undersigned counsel, brings this False Claims Act Complaint, on behalf of the United States of America and the State of Delaware, against Defendants Select Specialty Hospital – Wilmington, Inc. ("SSHW"), Select Specialty Hospitals, Inc. ("SSH"), Select Employment Services, Inc. ("SES"), Select Medical Corporation ("Select Medical"), and an individual, Crystal Cheek ("Cheek"). This action is brought by plaintiff to recover civil penalties and treble damages under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 and the Delaware False Claims and Reporting Act ("DFCRA"), Del. Code Ann. tit.6, § 1201-11.

## INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Delaware arising from false and/or fraudulent statements, records and claims made, or caused to be made, by the Defendants and/or their agents and employees.

2.      This *qui tam* case is brought against the Defendants for submitting and/or causing the submission of false claims by knowingly submitting reimbursement claims for services with forged signatures on orders and certifications of physicians, physician assistants, and nurse practitioners to Medicare, 42 U.S.C. § 1395 *et seq.*, Medicaid, 42 U.S.C. §1396 *et seq.*, and Federal Employee Health Benefits Program, 5 U.S.C. §§ 8901 *et seq.* (hereinafter collectively referred to as "Federal Healthcare Programs").

3.      Additionally, this *qui tam* case is brought against the Defendants for submitting and/or causing the submission of false claims by knowingly submitting reimbursement claims for services of physicians and nurse practitioners whose credentials were not examined or approved.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, as amended 31 U.S.C. §§ 3729-3733.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the Federal False Claims Act, 31 U.S.C. § 3732, including state law claims under 31 U.S.C. § 3732(b).  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this district.

## **THE PARTIES**

6.      Relator-Plaintiff Teresa Kelly ("Relator") is an adult citizen and resident of the Commonwealth of Pennsylvania.  Since September 2, 2014, Relator has been the Chief Nursing Officer ("CNO") of SSHW.  In that position she oversees day-to-day operations of the nursing, rehabilitation therapy, respiratory therapy, wound care, and dietary staff, as well as unit clerks and the telemetry technicians at SSHW.  Ms. Kelly has fourteen years experience in nursing.  As CNO of SSHW, she participates in Medical Executive Committee Meetings, in which issues regarding medical documentation, compliance, quality assurance, finances, and staff education and credentialing decisions are made**.**  Ms. Kelly has independent knowledge of all of the allegations against the Defendants and is the original source of the allegations contained in this Complaint.  Before filing this Complaint, Ms. Kelly made a disclosure of all material evidence and information in her possession to the Government as required by 31 U.S.C. § 3730(b)(2).

7.      Defendant SSHW is a Missouri corporation registered in the State of Delaware that owns and operates the long-term acute care hospital ("LTAC") located on the fifth floor of Saint Francis Hospital at 701 North Clayton Street, Wilmington, Delaware, which is SSHW's principal place of business.

8.      Defendant SSH is a corporation duly organized and existing under the laws of the State of Delaware.

9.      Defendant SES is a corporation duly organized and existing under the laws of the State of Delaware.  SES is the corporate entity who has paid wages to defendant Cheek.

3

10.     Defendant Select Medical is a corporation duly organized and existing under the laws of the State of Delaware.

11.     Defendants SSHW, SSH, SES, and Select Medical own, operate, and bill for services performed at the LTAC located on the fifth floor of Saint Francis Hospital at 701 North Clayton Street, Wilmington, Delaware.

12.     Defendant Crystal Cheek is an adult individual who is a citizen and resident of the State of Delaware.

## STATUTORY AND REGULATORY FRAMEWORK

### I.     The Federal False Claims Act

13.     The Federal False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $5,500 and $11,000 per claim.  31 U.S.C. § 3729(a),(g); 28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person . . . (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  *Id.* at § (b).  "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA.  *Id.*

### II.     Delaware False Claims and Reporting Act

14.     The DFCRA provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit

money or property to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties not less than $5,500 and not more than $11,000 per claim.  Del. Code Ann. tit.6, § 1201.

## III.    Federal Healthcare Programs

### A.    Medicare

15.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program. The Medicare program is a federally operated and funded program. It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

16.    The Medicare program is comprised of four parts.  Part A, hospital insurance, covers care in a long-term acute care hospital. 42 U.S.C. §§ 1395c, *et seq.* Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.* the fee schedule amount of physician and laboratory services. 42 U.S.C. §§ 1395j, *et seq.*   Part C, Medicare Advantage, are Medicare-approved private health insurance plans. 42 U.S.C. §§ 1395w-21, *et seq.* Part D is an optional plan that provides prescription drug coverage. 42 U.S.C. §§ 1395w-101, *et seq.*  Medicare parts A, B, and D are relevant in this action.

17.    To participate in Medicare, providers such as physicians, nurse practitioners, clinical nurse specialists and physician assistants (collectively referred to herein as "medical practitioners"), must certify and recertify that their services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose. 42 U.S.C. §§ 1395f (Part

A), 1395n (Part B); 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 424.5. A certification and recertification must be signed by the physician responsible for the case, or by another physician who has knowledge of the case and who is authorized to do so by the responsible physician or by the hospital's medical staff.  42 C.F.R. § 424.13 (c)(1). In other words, it is an express condition of payment that the treatment sought under Medicare must be certified and recertified as medically necessary and signed by a physician with knowledge of the patient's care. *Id.*

### B.   Medicaid

18.   Medicaid is a joint federal-state program that provides health care benefits for certain groups; however, Medicaid serves primarily the poor and disabled. Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided, under what conditions. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. The federal government provides a portion of each state's Medicaid funding. The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). In Delaware, the rate in effect from October 1, 2014 through September 30, 2015, was 53.63%.

19.   Like Medicare, a "claim" under Medicaid is only reimbursable if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member" 42 C.F.R. § 402.3.

### C.   Federal Employee Health Benefits Program

20.   The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM")

pursuant to 5 U.S.C. §§ 8901, *et seq.* Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees. Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

21.    Like Medicare, FEHBP contains hospitalization cost containment measures requiring medical practitioners to verify the medical necessity of any proposed treatment or surgery. 5 U.S.C. § 8902(n)(1)(A).

**IV.    Defendants' Use of Fraudulent Medical Practitioner Signatures**

**A.    Federal and State Government Healthcare Programs Reimbursement Requirements for Services**

22.    Both state and Federal Healthcare Programs require medical practitioners to sign orders, certifications and recertification statements, related to patients care.   These documentation requirements substantiate that the physician has reviewed the patient's condition and has determined that services or supplies are medically necessary.   CMS Medicare Program Integrity Manual (Publication 100-08), Chapter 3, Section 3.3.2.4.

23.    Physicians at SSHW have a major role in determining the utilization of health services furnished by providers.   Physicians decide upon admissions, order tests, drugs, and treatments, and determine the length of stay.   Accordingly, a condition for the Select Entities to receive payment from the Federal Healthcare Programs is that medical practitioners must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. § 424.10.

24.     SSHW is required to obtain the aforementioned certification and recertification statements from medical practitioners, keep these statements on file for verification by an intermediary, and certify on the appropriate billing form that the certification and recertification statements have been obtained and are on file.  42 C.F.R. § 424.11.

25.     Certification and recertification statements may only be signed by a physician, a nurse practitioner or clinical nurse specialist.  42 C.F.R. § 424.11(e).

26.     No specific procedures or forms are required for certification and recertification statements; however, there must be a separate statement signed by medical practitioners for each certification and recertification.  42 C.F.R. § 424.11(b).

27.     A physician must personally approve in writing that a patient be admitted to SSHW.  42 C.F.R. § 483.40, *see* 42 C.F.R. § 482.66 (requiring SSHW, as an LTAC, to comply with skilled nursing facility requirements).  After admission, a physician is required to supervise the medical care of each patient.  *Id.*  The physician is required to review the patient's total program of care, including medications and treatments, at required intervals. *Id.*

28.     Physicians are required to write, sign, and date progress notes at each visit.  42 C.F.R. § 483.40(b)(2).

29.     Physicians are required to sign and date all orders.  42 C.F.R. § 483.40(b)(3).

30.     If SSHW fails to obtain the required certification or recertification statement, or if a medical practitioner fails to sign an order, Federal Healthcare Programs will not reimburse SSHW for the treatment, order, or supplies.  Medicare Claims Processing Manual, c. 10, 10.1.

31.     Defendants submit claims for reimbursement to the Federal Healthcare Programs on the CMS-1450 Claims Form.   The Form 1450 requires SSHW to describe the services

provided to the patient using standardized numeric codes, CPT Codes.  SSHW is then reimbursed by the Federal Healthcare Programs.

32.   For each and every claim Defendants submitted to the Federal Healthcare Programs for reimbursement, Defendants certified that the medical practitioner certifications and re-certifications are on file and that the services were rendered for medical necessity.

33.   For each and every claim Defendants submitted to the Federal Healthcare Programs for reimbursement, Defendants also certified that records adequately describing services were maintained  and that any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal and State Laws.

34.   The Defendants were aware of, or should have been aware of, the conditions for repayment under Medicare, Medicaid, and FEHBP programs referred to in the preceding paragraphs.

35.   Additionally, SSHW is required to have an organized medical staff that operates under bylaws approved by the governing board and is responsible for the quality of medical care provided to patients by the hospital.  The medical staff must examine the credentials of all eligible candidates for medical staff membership and make recommendations to the governing body on the appointment of these candidates.  42 C.F.R. § 482.22.

**B.      Defendants' Improper Billing of Services to Federal Payors**

**1.      Forged Medical Practitioner Signatures on Medical Records**

36.   At SSHW, there are no electronic medical records in which providers contemporaneously enter information about encounters.  Physicians are unable to "e-sign" documents.  Instead, physicians may complete their medical documentation by dictating their impressions of their encounters with patients into a recording device.  Their notes are then

transcribed and returned to the physicians for their review and signature to be placed in the patient's chart.

37.     At SSHW, it is common practice for physicians to call in orders for patients by telephone.  These telephonic orders are referred to as "verbal orders."  These verbal orders are then written out by a nurse practitioner, physician assistant, or medical staff member, who then places the verbal order in a patient's chart.  The physician is then required to sign the verbal order to verify and certify that the treatment was requested and was medically necessary.

38.     In March 2015, SSHW's health information management ("HIM") manager was individual defendant Crystal Cheek ("Cheek"), who had been employed by Defendants in this role since approximately 2008.

39.     As HIM manager at SSHW, Cheek was responsible for gathering all the medical records at SSHW, ensuring the medical records complied with all Federal and state regulations, and submitting the medical records to the coding and billing department at Select Medical's corporate office in Mechanicsburg, Pennsylvania.

40.      As HIM manager at SSHW, Cheek was also responsible for ensuring that all physicians and physician assistants and nurse practitioners (hereinafter collectively referred to as "medical practitioners") who had privileges at SSHW to treat patients were properly credentialed.

41.     In March 2015, Cheek broke her shoulder and took a leave of absence from her role as HIM manager at SSHW.

42.     In March 2015, while Cheek was out on leave, SSH and/or Select Medical sent their Corporate Interim Health Information and Credentialing Manager, Kathleen Dawiedczyk, to perform Cheek's duties at SSHW.

43.     In March 2015, while Cheek was out on leave, Dawiedszyk called Relator into Cheek's office, lifted up the desk calendar on Cheek's desk, and showed Relator approximately forty-two (42) small pieces of paper, each containing one cut-out signature of a medical practitioner who had privileges at SSHW.  Dawiedszyk then showed Relator a discharged patient chart in which Cheek had placed cut-out medical practitioner signatures above the signature line on various medical records, which the medical practitioners did not sign, for services charged to Federal and State Healthcare Programs throughout the patient's stay at SSHW.   Three photographs of these cut-out medical practitioner signatures are attached hereto as Exhibit "A."

44.     In March 2015, an investigation conducted by Dawiedszyk revealed that, when Cheek received a medical record that was not signed or certified by the appropriate medical practitioner, instead of locating the medical practitioner and having that individual sign the unsigned and unverified medical record, Cheek had been routinely placing the copy of the medical practitioner signature that she kept in her office above the signature line on the document, then photocopying the record so that it appeared the medical practitioner signed the medical record when, in fact, the practitioner did not sign the document (hereinafter these records are collectively referred to as the "forged medical records").  Cheek would then place the photocopied document, which contained the forged signature, in the patient's medical chart.

45.     In March 2015, an investigation conducted by Dawiedszyk revealed that Cheek then scanned and uploaded the forged medical records to SSH/Select Medical's corporate office for coding and billing to the Federal and State Healthcare Programs.

46.     Upon information and belief, in March 2015, Dawiedszyk completed a report of her investigatory findings described above regarding these forged medical records and

Dawiedszyk submitted this report to Sharon Rosetti ("Rosetti"), the CEO of SSHW, and to Dawiedszyk's supervisors at SSH/Select Medical.

47.     In March 2015, Relator also reported Cheek's conduct to Rosetti, to which Rosetti told Relator that she was aware of Dawiedszyk's report and its findings regarding the forged medical records.

48.     Despite March 2015's revelation that SSHW's HIM manager, Cheek, was falsifying medical practitioner signatures on medical records, no one at the Select Defendants is believed to have discarded Cheek's copies of the medical practitioner signatures or to have taken measures to ensure that Cheek's fraudulent conduct would cease.

49.     In March 2015, it was uncovered that Cheek had routinely been forging medical practitioner signatures on records throughout patient charts, including but not limited to, orders and certifications for the following:

      (a)      admission orders;
      (b)      medications, including prescription medication/pharmacy orders;
      (c)      renal dialysis orders and reports;
      (d)      medical supply orders;
      (e)      surgery operative reports;
      (f)      radiology orders, including those for ultrasound, cat scans, and MRIs;
      (g)      laboratory orders;
      (h)      electrocardiograph orders;
      (i)      respiratory therapy orders, including, requests for oxygen, ventilators, and equipment;
      (j)      occupational therapy orders;
      (k)      speech therapy orders;
      (l)      dietary orders; and,
      (m)      physical therapy orders.

50.     Cheek had been forging medical practitioner signatures on orders, certifications, and re-certifications for years before Dawiedszyk's  March 2015 discovery and this was known by Rosetti and other managers at SSHW.

51.     Despite March 2015's aforementioned discovery, in April 2015, Cheek returned to work and Cheek continued to forge physician and nurse practitioner signatures on unsigned medical records.

52.     In June 2015, Sharon Rosetti was fired as CEO of SSHW for her role, in part, of falsifying SSHW's ventilator wean rates on reports given to a physician's group and for withholding the alleged malpractice of a physician at SSHW.  Neither of these incidents are at issue in this present action.

53.     In September 2015, SSHW hired Donna Gares to replace Rosetti as CEO.  Shortly after Gares was hired, Relator told Gares that SSH and/or Select Medical were conducting an investigation into the HIM manager's conduct.

54.     In November 2015, HIM assistant, Katie Desmond, approached Relator and told Relator that Cheek was continuing to forge medical records.  During this discussion, Desmond showed Relator recent medical records in which Cheek had forged medical practitioner signatures after this fraudulent conduct had been reported to Rosetti, SSH, and/or Select Medical.

55.     In November 2015, after Desmond showed Relator the aforementioned recently forged medical records, Relator told Gares about Cheek's ongoing fraudulent conduct, to which Gares responded that the corporate office (SSH and/or Select Medical) were aware.

56.     In January 2016, Dawiedszyk returned to SSHW and during this visit Dawiedszyk told Relator that she pulled seven (7) discharged patient files randomly from the HIM office and found forged signatures on records in each patient's medical chart.

57.     In January 2016, Relator reviewed five (5) patient charts and found that each of these charts contained at least one forged medical practitioner signature.  Relator found forged

medical practitioner signatures on one operative report, one verbal order, and various history and physical examinations and consultations.

58.     In January 2016, shortly after Relator's aforementioned conversation with Dawiedszyk, Relator met with Gares and Relator showed Gares photographs of the cut-out medical practitioner signatures that had been found on Cheek's desk, as well as copies of medical records in which Cheek had "signed" with the cut-out medical practitioner signatures.

59.     On January 26, 2016, Gares sent both Cheek and Desmond home from SSHW.

60.     On January 26, 2016, Gares initiated an investigation regarding Cheek's use of the cut-out medical practitioner signatures on medical records at SSHW.

61.     During the first week of February 2016, Cheek was brought back to SSHW and Cheek gave a statement to Gares about her use of the cut-out medical practitioner signatures.

62.     SSHW terminated Cheek's employment and her last day at SSHW was on or about January 26, 2016.

63.     Upon information and belief, Gares' investigation that began on January 26, 2016, revealed that, in addition to Cheek's forging of medical practitioner signatures, Cheek had not been examining the credentials of medical practitioners as her job duties required.

64.     On or about February 18, 2016, an emergency medical executive meeting was held, at which physicians were asked to approve temporary privileges at SSHW for physicians and nurse practitioners who had been treating patients at SSHW without having their credentials examined and approved.  However, the physicians present at the meeting were not told why temporary privileges were required.  At this meeting, Cheek's forging of medical practitioner signatures was not discussed.

65.     On or about February 20, 2016, Relator confronted Gares and told Gares that she believed the physicians on the medical executive committee should have been told that: (1) Cheek had been forging medical practitioner signatures on patient medical records, and (2) that Cheek failed to examine the credentials of medical practitioners who had privileges at SSHW.

66.     On or about February 26, 2016, Relator had a phone call with Robert Breighner, the Vice President of Compliance and Audit Services at Select Medical.  During this phone call, Relator expressed concern over the Select Entities handling of Cheek's forging of medical practitioner signatures. In response thereto, Breighner stated that Cheek's use of the forged signatures was not a reportable offense to any governmental entity because "it was a he said, she said situation," but that Cheek was being monitored and that he "was comfortable with the charts at risk."

67.     During Relator's aforementioned phone call with Breighner, Relator expressed additional concern over SSHW's failure to ensure that those medical practitioners who had privileges at SSHW were properly credentialed.  Breighner stated he was unaware of any failure of SSHW to approve the credentials of those medical practitioners who had privileges at SSHW.

68.     Defendants have taken no action to correct Cheek's forged medical records.

69.     Defendants have not reported any conduct alleged in this present action to the Office of Inspector General ("OIG") of the United States Department of Health and Human Services Self-Disclosure Protocol.

70.     Defendants are required to disclose all known errors and omissions in its claims for reimbursement from the Federal Healthcare Programs.   42 U.S.C.  1320(a)-7b(a)(3) specifically creates a duty to disclose known errors in requests for reimbursement from the Federal Healthcare Programs: "Whoever. . . having knowledge of the occurrence of any event

affecting (A) his initial or continued right to any such benefit or payment. . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized. . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony."

71.     42 U.S.C. § 1320a-7a(a)(8) specifically states that any entity that "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program" shall be subject to civil penalties set forth therein.

72.     By submitting CMS Forms 1450 to the Federal Healthcare Programs for reimbursement, Defendants certified that the medical practitioners signed orders, certifications, and re-certifications are on file and that the services were rendered for medical necessity.

73.     By failing to obtain medical practitioner signatures on medical orders, certifications and re-certifications, and certifying to the Federal Healthcare Programs that such orders, certifications, and re-certifications were on file, Defendants submitted false or fraudulent claims to the Federal Healthcare Programs.

74.     By forging medical practitioner signatures on medical orders, certifications, and re-certifications, Defendants submitted false or fraudulent claims to the Federal Healthcare Programs.

75.     By forging medical practitioner signatures on medical orders, certifications and re-certifications, SSHW failed to substantiate or authenticate that a physician or nurse practitioner or physician's assistant reviewed the patient's condition and has determined that services or supplies were medically necessary.

76.     By forging medical practitioner signatures on medical orders, certifications and re-certifications, Defendants knowingly submitted false or fraudulent claims to the Federal Healthcare Programs.

77.     By forging medical practitioner signatures on medical orders, certifications and re-certifications, Defendants knowingly submitted false or fraudulent claims to the Delaware Medicaid Program.

78.     The Federal Healthcare Programs would not have remitted payment to Defendants if it had known Defendants forged medical practitioner signatures on those documents referenced in Paragraph 49.

79.     The Delaware Medicaid Program would not have remitted payment to Defendants if it had known Defendants forged medical practitioner signatures on those documents referenced in Paragraph 49.

### 2.     Defendants Failure to Examine Credentials of Medical Practitioners

80.     Upon information and belief, Gares' investigation that began on January 26, 2016, revealed that Cheek had not been examining the credentials of medical practitioners as her job duties required.

81.     SSHW is required to have an organized medical staff that operates under bylaws approved by the governing board and is responsible for the quality of medical care provided to patients by the hospital.  The medical staff must examine the credentials of all eligible candidates for medical staff membership and make recommendations to the governing body on the appointment of these candidates.  42 C.F.R. § 482.22.

82.     During Cheek's employment at SSHW, physicians, physician assistants, and nurse practitioners who had treated patients at SSHW may have lacked the proper credentials to

treat patients because Cheek never examined their credentials, which SSHW was required to do pursuant to 42 C.F.R. § 482.22.

83.     In submitting CMS Form 1450s to the Federal Healthcare Programs, Defendants impliedly certified that the medical practitioners rendering services had their credentials examined and approved by SSHW's governing body.

84.     By failing to examine and approve the credentials of the medical practitioners rendering services to patients at SSHW, Defendants submitted false and fraudulent claims to the Federal Healthcare Programs.

### COUNT I
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)
### (Presenting or Causing Presentment of a False Claim)

85.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

86.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### COUNT II
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)
### (Knowingly Presenting a False or Fraudulent Record)

87.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

88.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

## COUNT III
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(G)
### (False Record to Avoid an Obligation to Refund)

89.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

90.     By virtue of the acts described above, Defendants knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

91.     By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT IV
### DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit.6, § 1201-11

92.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

93.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false records or statements material to false or fraudulent claims in determining rights to benefits or payments under the Delaware Medicaid Program.  Del. Code Ann. tit.6, § 1201-11.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff United States of America demands that judgment be entered in its favor and against the Defendants as follows:

A.      On Count I (Presenting or Causing Presentment of False Claims), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial;

B.      On Count II (Knowingly Presenting A False Or Fraudulent Record), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial;

C.      On Count III (False Record to Avoid an Obligation to Refund), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial.

WHEREFORE, Plaintiff the State of Delaware demands that judgment be entered in its favor and against the Defendants as follows:

D.      On Count IV(Knowingly Making a False Statement in Connection with Determining Right to Payment), judgment against the Defendants for treble damages as further established at trial plus a penalty of $10,000 per false claim as established at trial.

## DEMAND FOR A JURY TRIAL

The United States of America, the State of Delaware, and Relator prays a jury trial in this action.

Respectfully submitted,

*/s/ R. Karl Hill*

_____

R. Karl Hill
Delaware Bar No. 2747
SEITZ, VAN OGTROP & GREEN, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
Telephone: (302) 888-7604
Facsimile: (302) 888-0606

Joel W. Goldberg, Esq.
Admitted *Pro Hac Vice*
GOLDBERG , GOLDBERG & JANOSKI
213-215 West Miner Street
West Chester, PA 19382
Telephone:  (610) 436-6220
Facsimile:  (610) 436-0628
jgoldberg@ggj.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via certified U.S. mail, this 17th day of May, 2017, to:

David C. Weiss
Jennifer L. Hall
Nemours Building
U.S. Attorney's Office
1007 Orange Street
Suite 700
Wilmington, DE 19801

Diana Rabeh
REED SMITH, LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Thomas H. Suddath, Jr.
REED SMITH, LLP
1717 Arch Street, Ste. 3100
Philadelphia, PA 19103

Respectfully submitted,

*/s/ Joel W. Goldberg, Esq.*
_____
Joel W. Goldberg, Esq.